**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                )
**CAROLINA ZALDUONDO,**                         )
                                                )
           **Plaintiff,**                       )
                                                )
           **v.**                               )        **Civil No. 10-1685 (RCL)**
                                                )
**AETNA LIFE INSURANCE COMPANY,**               )
                                                )
           **Defendant.**                       )
_____)

**MEMORANDUM OPINION**

Plaintiff Carolina Zalduondo brought this ERISA suit against defendant Aetna Life

Insurance Company, alleging denial of benefits and the improper refusal to pay for her hip

arthroscopy at Aetna's in-network rate.  Before the Court is Aetna's Motion for Summary

Judgment, Sept. 24, 2012, ECF No. 37.  Upon consideration of the defendant's motion, the

plaintiff's Opposition, Oct. 16, 2012, ECF No. 43, the defendant's Reply thereto, Oct. 26, 2012,

ECF No. 47, the applicable law, and the record herein, the Court will deny Aetna's motion

without prejudice and instruct Aetna to supplement the administrative record with the official

Plan documents.

**I.      BACKGROUND**

Zalduondo participated in WPP Group USA, Inc.'s self-funded employee healthcare

benefit plan ("the Plan").  Def.'s Statement of Undisputed Material Fact in support of its Mot.

Summ. J. ¶¶ 2, 5, ECF No. 38 ("Def.'s SUMF"); *see* Pl.'s Am. Compl. ¶¶ 4–7, ECF No. 5.  WPP

Group is the Plan sponsor and administrator; however, Aetna, pursuant to an Administrative

Services Agreement ("ASA") with WPP Group, is a service provider to the Plan that administers

and adjudicates claims for benefits under the Plan.  Def.'s SUMF ¶¶ 8–9; Pl.'s Am. Compl. ¶ 9;

*see* ASA, AR[1] 120–58, ECF No. 40.  According to the Summary Plan Description ("SPD") for the WPP Group USA, Inc. Benefit Plan, WPP Group "delegated to Aetna the discretionary authority to construe and interpret the terms of the Plan, and to make final, binding determinations concerning availability of benefits under the Plan."  AR 248; *see* Def.'s SUMF ¶¶15–18; Pl.'s Statement of Material Facts to which Genuine Issues Exist ¶ 2, ECF No. 43–1 ("Pl.'s SDMF"); Pl.'s Am. Compl. ¶ 10.  However, the SPD is prefaced by the following, clearly identified, disclaimer:

> Please note that this SPD describes benefits provided under a portion of the WPP Group USA, Inc. Benefits Plan.  The information provided in this SPD is not intended to be a complete description of every detail of the WPP Group USA, Inc. Benefits Plan and the official plan documents (collectively, the "Plan Documents").  The benefits described herein are governed by the underlying Plan Documents.  Accordingly, if there is a discrepancy or conflict between this SPD and the Plan Documents, then the Plan Documents will govern.  The official Plan Documents are always controlling over any statement made in this SPD or by any employee of WPP, you[r] Employer, Aetna Life Insurance Company, or any other administrator.  Benefits described in this SPD are not insured with Aetna or any of its affiliates, but will be paid from the Employer's funds.  Aetna and its affiliates provide certain administrative services under the Plan.

AR 167; Pl.'s SDMF ¶ 6.  Aetna did not include the Plan documents in the administrative record, and redacted Appendix I of the proffered ASA, which is referenced several times in the ASA as providing a description of the Plan.  *See* Pl.'s SDMF ¶ 3; AR 120, 121, 130.

### A.    *Zalduondo's Medical Treatment*

Zalduondo alleges she began experiencing "severe pain in her hip" in 2009, for which she pursued medical treatment.  Pl.'s SDMF ¶ 21; Def.'s SUMF ¶ 28.  On August 21, 2009, Zalduondo consulted with Dr. Terri McCambridge, an in-network provider.  *See* AR 77.  Dr. McCambridge ordered an MRI of Zalduondo's distressed hip, and the report revealed two labral tears.  *Id.*  Dr. McCambridge referred Zalduondo to Dr. Andrew Wolff, an out-of-network

---

[1] AR __ refers to page numbers in the Administrative Record, filed under seal by Aetna as Exhibit A to its SUMF.

orthopedic surgeon, for arthroscopic hip surgery.  Def.'s SUMF ¶ 31; Pl.'s SDMF ¶ 23 (not

disputing Def.'s SUMF ¶ 31).   Six days later, Zalduondo contacted Aetna to request

precertification for Dr. Wolff's services at the in-network benefit rate, claiming "there were no

in-network physicians who could provide her surgery."  Pl.'s SDMF ¶ 26; Def.'s SUMF ¶ 32.

On September 16, after receiving notice that Aetna denied her precertification request and prior

to appealing that determination, Zalduondo elected to undergo arthroscopic hip surgery

performed by Dr. Wolff.  *See* Def.'s SUMF ¶¶ 33–39; Pl.'s SDMF ¶ 31 (not disputing the

surgery but arguing she first consulted in-network providers listed by Aetna); Def.'s Reply ¶ 2.

Following her surgery, Zalduondo received Explanations of Benefits ("EOBs") indicating certain

charges relating to the surgery were not payable either because "(1) [Zalduondo] failed to obtain

precertification for services provided by a non-participating provider (*i.e.*, Dr. Wolff); (2) the

charges were not reasonable and appropriate; and/or (3) the charges were for or connected with

services or supplies considered by Aetna to be experimental or investigational."  Def.'s SUMF ¶

41 (internal citations omitted) (not disputing Pl.'s Amend. Compl. ¶ 29).

### B.      Aetna's Claim Adjudication

Zalduondo contacted Aetna prior to undergoing surgery in order to request that services

performed by Dr. Wolff be covered at the in-network benefit rate.  Def.'s SUMF ¶ 32; Pl.'s

Opp'n 5; AR 81.  On September 1, 2009, Aetna Medical Director Dr. Richard Fornadel denied

the request for coverage at the in-network preferred benefit level, noting that the reason[2] for

---

[2] Notwithstanding the singular reason stated in Aetna's coverage determination letter, Zalduondo alleges the letter
"inexplicably states that the decision to not treat Dr. Wolff at the in network [sic] preferred benefit level was made
in part because the services requested were not medically necessary."  Pl.'s Opp'n 5; *see* Pl.'s SDMF ¶ 34 (claiming
Aetna's denial letter "states that in addition to there being other in-network physicians available, the decision was
made because the services requested were not medically necessary").  The Court acknowledges the text Zalduondo
references, which states that Aetna's decision was based on guiding provisions "with respect to services and supplies
that are not medically necessary."  *See* AR 81.  This revelation does not necessarily help Zalduondo, however, as it
suggests that, given the text of her subsequent appeal of this denial letter, she appealed *only* the determination that
there were in-network physicians available, and, furthermore, that she elected to proceed with surgery even after

denial was that "services are available from participating providers." AR 81. The letter provided the names and contact information for three participating providers that allegedly offered the requested services and directed Zalduondo to Aetna DocFind, an online directory where Zalduondo could find additional participating providers. *Id.* Additionally, the letter stated, in bold text:

> Your benefit plan includes an out-of-network benefit component for the use of non-participating providers. If you elect to use the services of the above mentioned non-participating provider, your out-of-network non-preferred benefit level will apply.

> In order for you to receive the in-network preferred benefit level of coverage, either you or an Aetna participating provider must obtain prior coverage approval.

*Id.* The letter went on to disclose the availability and process of appeals to the adverse benefits determination. AR 82–83.

Zalduondo appealed Aetna's claim determination on October 1, 2009, stating that "none of the in-network/participating providers in my designated area . . . were viable options." AR 67. Zalduondo's appeal admitted that she received Aetna's letter on September 7, prior to undergoing surgery, and that she carefully investigated the in-network physicians listed in the letter only to find that two of the three did not perform hip arthroscopy and the remaining provider, Dr. John N. Delahay, "appear[ed] to have no/limited experience with arthroscopic hip surgery . . . clearly establishing a lack of qualification." AR 67–68. Zalduondo requested that the claim determination be overturned because, after exploring "all of the participating providers in [her] designated area," she "established that none . . . are viable options due to either no longer practicing, not practicing [arthroscopic hip surgery] or not being viable options to provide [arthroscopic hip surgery]." AR 68. Zalduondo attempted to clarify what she meant by "viable

being provided with a letter that "inexplicably" provided that the services were deemed not medically necessary. *See* AR 67–69.

option," stating that, for her, "it was of the utmost importance . . . to be treated by an orthopaedic that has performed a sufficient number of arthroscopic hip surgeries."   AR 69.   Absent in Zalduondo's three-page appeal is any mention of a challenge to a determination that her procedure was not medically necessary.   *See* AR 67–69.

On November 18, 2009, Aetna sent Zalduondo a letter in response to her first-level appeal.   AR 85.   In its Level 1 Appeal Decision, Aetna twice clarified that the appeal was about "the denial of in-network preferred benefit level for health care services provided by Dr. Wolff." *Id.*   Aetna claimed to have reviewed "all available information," including "[Zalduondo's] appeal letter, the operative report, Aetna Patient Management file, DocFind and WPP Group USA, Inc.'s Summary Plan Description."   *Id.*   Aetna upheld its previous determination because it found available participating providers who could have performed Zalduondo's requested healthcare services, including Drs. Mark Zawadsky and Brian Evans.   *Id.*   Aetna further informed Zalduondo that she could request a second level appeal by forwarding to Aetna, within sixty days, any relevant material she wished Aetna to consider along with her request.   AR 86.

On January 8, 2010, Zalduondo requested a second level appeal of Aetna's coverage determination.   AR 88.   Zalduondo stated she was "not satisfied with Aetna's ongoing decisions regarding coverage in this matter, including but not limited to Aetna's decision stated in the November 18, 2009[,] appeal resolution letter."   *Id.*   Zalduondo reiterated her opaque intent by stating she wished to appeal "several of Aetna's more recent decisions regarding coverage in this matter."   *Id.*   Despite this apparent attempt at initiating a new appeal of an unidentified coverage determination, Zalduondo stated the letter "serve[d] as [her] official request for a second level appeal;" however, on the same page she requested an extension "for filing [her] second level appeal."   *Id.*

5

Aetna responded to Zalduondo on January 27, 2010, with a letter entitled "Final Appeal Decision," in which it again upheld its decision to deny in-network benefits for out-of-network services due to the availability of in-network providers to treat Zalduondo's condition.  AR 99. Aetna specifically referenced the availability of Dr. Mark Zawadsky.  *Id.*  Aetna's letter made no reference to the request for an extension nor did it address Zalduondo's intent to expand the scope of her appeal.  *See id.*

On February 4th, allegedly before Zalduondo received the January 27th Final Appeal Decision from Aetna, Zalduondo, through counsel, sent what was stated as "the second and final appeal" of Aetna's denial of in-network preferred benefit level for Dr. Wolff's services.  AR 107. The argument submitted by counsel was that Dr. Zawadsky was not "qualified" to treat Zalduondo because he had "only performed 25 arthroscopic surgeries."[3]  *Id.*  For the first time, the letter specifically raised the separate issue of denial of coverage for Zalduondo's procedure on the ground that the procedures were experimental.  AR 108.  Zalduondo's counsel requested a favorable decision with respect to both the denial of the preferred benefit level for Dr. Wolff's services and the coverage determination that the arthroscopy was experimental.  *Id.*  On February 15, Aetna notified Zalduondo that it received her letter dated February 4, 2010, but that she had exhausted her internal appeal rights.  AR 103.  The next step, according to Aetna's Appeal Process & Member Rights disclosure, was for Zalduondo to file a civil action under Section 502(a) of ERISA.  *See* AR 118.

---

[3] Zalduondo's SDMF is inconsistent with respect to her counsel's statement that Dr. Zawadsky was unqualified due to only performing twenty-five arthroscopic surgeries.  *Compare* Pl.'s SDMF ¶ 30 (acknowledging that Aetna identified in-network physicians that performed arthroscopic hip surgery, referencing Dr. Zawadsky), *with id.* ¶¶ 40–41 (disputing the same reference to Dr. Zawadsky acknowledged in ¶ 30, and further stating that Dr. Zawadsky "does not perform arthroscopic surgery to correct labral tears," citing her counsel's February 4 letter).

C.      **Procedural History**

1.      **Pleadings**

Zalduondo initiated this ERISA action with a Complaint filed in the district court on October 4, 2010, alleging improper denial of her benefit claim, in violation of 29 U.S.C. § 1132, and breach of fiduciary duties, in violation of § 1104.  Pl.'s Compl. ¶¶ 35, 38, 45.  Zalduondo requested "payment of her medical bills consistent with the in-network preferred benefit level," "damages resulting from [Aetna's] breach of [its] fiduciary duties," and other "equitable remedies."  *Id.* at 2, 8–9.  After Aetna moved to dismiss the Complaint, *see* Def.'s Mot. Dismiss, ECF No. 4, Zalduondo filed an Amended Complaint addressing deficiencies highlighted in Aetna's Motion to Dismiss.  *See* Pl.'s Am. Compl. 1 (claiming to be bringing the claim "on behalf of herself and WPP Group Medical Plan"); *id.* ¶¶ 9–11 (clarifying Aetna's role as service provider under the Plan and noting that Aetna "exercises discretion and control over the plan" when administering claims).

Aetna then filed a Motion to Dismiss the Amended Complaint, arguing that the denial of benefits claim failed for failure to exhaust administrative remedies, and that the breach of fiduciary duties claim failed for failure to allege harm to the Plan and because adequate remedy was available under the denial of benefits claim.  Def.'s Mot. Dismiss Am. Compl. 5–12, ECF No. 6.  The Court[4] granted Aetna's motion with respect to Claim Two (breach of fiduciary duties) but preserved the claim that Aetna improperly denied Zalduondo's request to treat the services provided by Dr. Wolff at the in-network benefit level in Claim One.  *See Zalduondo v. Aetna Life Ins. Co.,* 845 F. Supp. 2d 146, 154–55 (D.D.C. 2011).  Zalduondo moved the Court to reconsider its ruling in light of the Supreme Court's decision in *Cigna Corp. v. Amara*, 131 S. Ct.

---

[4] This case was first assigned to Judge Roberts, and subsequently reassigned to Judge Howell on January 21, 2011. On February 3, 2012, the case was reassigned by consent to the undersigned Judge.

1866 (2011), suggesting that the Court "rejected considering" the Supreme Court's guidance on the availability of § 1132(a)(3) claims in addition to § 1132(a)(1)(B) claims. Pl.'s Mem. in support of its Mot. Recons. 3, ECF No. 17–1. The Court disagreed with Zalduondo's interpretation of Amara, and clarified that her § 1132(a)(1)(B) claim failed because she failed to plead, and the prima facie evidence failed to show, that § 1132(a)(1)(B) could not provide adequate relief. *See* Mem. Op. 4–8, ECF No. 28; Order, ECF No. 27.

Zalduondo also sought to cure her failure to plead exhaustion of administrative remedies in her Amended Complaint by requesting leave to file a Second Amended Complaint. *See* Mot. for leave to file a 2d Amend. Compl., ECF No. 18; Proposed Am. Compl. ¶ 4–5, ECF No. 18–2. In addition to supplementing her Amended Complaint with facts, which if true demonstrated exhaustion of remedies for her claim of improper denial of coverage, Zalduondo sought to augment her Amended Complaint by adding the Plan and Plan Administrator as defendants and adding a claim against the Plan Administrator. *See* Proposed Am. Compl. 1, ¶¶ 4–5, 23–24, 33–34, 37–38, 55–57. The Court denied that motion but determined that the facts alleged in paragraphs 4, 5, 23, 24, 33, 34, 37, and 38 established that Zalduondo exhausted her administrative remedies and, therefore, deemed them incorporated into the Amended Complaint. Mem. Op. 10, May 23, 2012, ECF No. 28. Thus, the Court allowed Zalduondo to proceed on two claims under 29 U.S.C. § 1132(a)(1)(B): (1) that Aetna improperly refused to pay Dr. Wolff at the in-network benefit level; and (2) that Aetna improperly denied coverage for the procedure. *Id.*; Order, ECF No. 27.

## 2. Discovery

On June 19, 2012, Zalduondo timely filed a motion for discovery. Mot. Disc., ECF No. 30. Zalduondo sought discovery "into the completeness of the administrative record," alleging

that a list of specific information was "notably absent" from the administrative record, specifically

> (1) the Plan document; (2) a log of all oral communications between [Zalduondo] and [Aetna], with corresponding summaries of same; (3) a log of any communications relating to the initial request for preauthorization and decision denying preauthorization, with corresponding summaries of the same; (4) information and listings from 'DocFind Provider Directory' that [Aetna] says it relied upon when denying [Zalduondo's] claim; and (5) resumes, compensation arrangements, and other information concerning the individuals who received [Zalduondo's] claim.

*Id.* at 3.  Zalduondo argued that "the Plan document is a necessary part of the administrative record" since an ERISA claim brought under 29 U.S.C. § 1132(a)(1)(B) seeks benefits due "under the terms of [the] plan." *Id.* at 4.  Aetna opposed discovery *in toto*, conclusorily arguing that because the discretionary standard of review applied, the practice in the district court is to "prohibit[] discovery."  Opp'n to Pl.'s Mot. Disc. ¶ 2, ECF No. 31.  In response to Zalduondo's request for the Plan document, Aetna retorted that the administrative record included a ninety-two page SPD for the Plan.  *Id.* ¶ 7.  Furthermore, Aetna noted that the record "never references any 'Plan document' that Aetna relied upon other than the SPD." *Id.*[5]

On August 24, 2012, the Court denied Zalduondo's request for discovery, finding that the deficiencies she alleged in her motion could be properly addressed in her opposition to summary judgment.  Order, ECF No. 34.  The Court deemed that production of the Plan document, at that time, was premature; however, the Court instructed Zalduondo that she could "move to establish

---

[5] Aetna also faults Zalduondo for failure to note in her discovery motion that Aetna is not the Plan administrator, which, under Aetna's reading of *Wright v. Metropolitan Life Ins. Co.*, 618 F. Supp. 2d 43 (D.D.C. 2009), suggests production of a Plan document during discovery is unnecessary.  Opp'n to Pl.'s Mot. Disc. 3–4.  This Court finds Aetna's parenthetical, stating that the court in *Wright* "den[ied] plaintiff's request for production of ERISA plan document from insurer that . . . was not plan administrator," *id.* at 4, materially erroneous.  It is the Court's belief that Aetna may be referring to the defendant's claim that production of plan documents was not required *during its claims review* because it was not the plan administrator.  *See Wright*, 618 F. Supp. 2d at 59 (addressing plaintiff's claim under 29 C.F.R. § 2560.503-1(h)(2)(iii)).  In *Wright*, the plan document *was produced* in the administrative record and served as the basis for the court's standard of review determination and analysis of the plaintiff's claims under 29 U.S.C. § 1132(a)(1)(B).  *Id.* at 46–48, 51–54, 56–59.

that the summary plan description is an inadequate basis for the Court to award summary judgment." *Id.*

### 3.     Summary Judgment

Aetna filed its motion for summary judgment with the Court on September 24, 2012, contemporaneously submitting its SUMF and a consent motion to file Exhibit A, the administrative record, under seal. *See* Def.'s Mot. Summ. J., ECF No. 37; Mem. in support of its Mot., ECF No. 37–1 ("Def.'s Mem."); SUMF, ECF No. 38; Mot. File Under Seal Ex. A to Def.'s SUMF, ECF No. 35.   After receiving an extension, Zalduondo filed her opposition brief and SDMF.   *See* Pl.'s Mem. in support of her Opp'n to Def.'s Mot. Summ. J., ECF No. 43 ("Pl.'s Mem."); Pl.'s SDMF, ECF No. 43–1.   Conspicuously absent from her SDMF filing was Exhibit B thereto, which Zalduondo attempted to file under seal via consent motion the following day. *See* Consent Mot. to Seal Ex. B to Pl.'s SDMF, ECF No. 44.   Exhibit B is described in this Court's order contemporaneously issued with this opinion, the underlying dispute of which need not be revisited here.

## II.   LEGAL STANDARD

### A.     Summary Judgment

"The court shall grant summary judgment if the movant shows that (1) there is no genuine dispute as to any material fact *and* (2) the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The mere existence of *any* factual dispute will not defeat summary judgment; the requirement is that there be no *genuine* dispute about a *material* fact.   *Anderson*, 477 U.S. at 247–48.   A fact is material if, under the applicable law, it could affect the outcome of the case. *Id.* at 248.   A dispute is genuine if the "evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* In order for the dispute to be genuine, a nonmoving party must present enough specific facts, beyond mere allegations or conclusory statements, that would enable a reasonable jury to find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999).

The court must find that the movant is entitled to "judgment as a matter of law" in order to grant summary judgment, Fed. R. Civ. P. 56(a), and, therefore, must find that there is no genuine issue for trial. There is no genuine issue for trial unless the nonmoving party provides sufficient favorable evidence to enable a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 250–51. The burden is on the moving party to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### B.       ERISA Standard of Review under 29 U.S.C. § 1132(a)(1)(B)

Congress enacted the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified in scattered sections of  29 U.S.C.) ("ERISA"), in order to protect the interests of participants of employee benefit plans by establishing standards of conduct and disclosure requirements for fiduciaries of employee benefit plans "and by providing for appropriate remedies, sanctions, and ready access to the federal courts." ERISA § 2(B). While ERISA provides "a panoply of remedial devices," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989) (internal quotations and citations omitted), section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." In reviewing a denial of benefits claim, the court is restricted to the evidence available to the claim

administrator at the time of the decision.  *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1455 (D.C. Cir. 1992) ("Courts review ERISA-plan benefit decisions on the evidence presented to the plan administrators, not on a record later made in another forum.").

    So-called denial of benefits claims under § 1132(a)(1)(B) are subject to a judicially-subscribed *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone*, 489 U.S. at 115.  When a benefit plan confers such discretionary authority, a "more deferential arbitrary and capricious standard" applies.  *Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011) (citing *Firestone*, 489 U.S. at 115). The D.C. Circuit "has defined the *Firestone* deferential standard as one of reasonableness."  *Id.* at 435 (quoting *Wagener v. SBC Pension Benefit Plan–Non Bargained Program*, 407 F.3d 395, 402 (D.C. Cir. 2005); *Block*, 952 F.2d at 1452 (D.C. Cir. 1992)) (internal quotations omitted). Thus, when a plaintiff brings a denial of benefits claim against a defendant who exercised its plan-conferred discretionary authority, the question for the court is whether the defendant acted reasonably in reaching its coverage determination.  *See id.*  Indeed, some courts articulate that, when courts are confined to the deferential standard of review in an ERISA case, motions for summary judgment "are merely procedural vehicles for the Court's determination of whether the [defendant's] actions were reasonable."  *James v. Int'l Painters & Allied Trades Indus. Pension Plan*, 844 F. Supp. 2d 131, 141 (D.D.C. 2012) (citing, *e.g.*, *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005)).  The Court can find reasonableness where a decision "is the result of a deliberate, principled reasoning process and . . . supported by substantial evidence." *Buford v. UNUM Life Ins. Co. of Am.,* 290 F. Supp. 2d 92, 100 (D.D.C. 2003) (internal quotations omitted).  Substantial evidence simply refers to "'more than a scintilla'" of evidence.

*Id.* (quoting *Leonard v. Southwestern Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003)).

## III.   DISCUSSION

Aetna first argues that its claim decision was entitled to deferential review due to the grant of discretion found in the SPD.   Def.'s Mem. 5–6 (citing *Firestone*).   Under deferential review, Aetna submits, the decision to deny the in-network benefit level to Zalduondo's hip arthroscopy was reasonable because the language of the SPD provided clear warning of the need for precertification and the consequences of failing to do so.   *Id.* at 6–7.   Furthermore, Aetna avers that Zalduondo based her claim on nothing more than her opinion that no in-network orthopedic surgeon was qualified to treat her.   *See id.* at 7–11.   Additionally, Aetna argues that the Court should dismiss without prejudice the claim for improper denial of coverage because Zalduondo never appealed the determination that certain procedures were experimental, and thus, failed to exhaust administrative remedies.   *Id.* at 12–13.

In her opposition, Zalduondo challenges Aetna's standard of review argument and submits that, even if a deferential standard applied, the administrative record lacks substantial evidence to support a conclusion that Aetna's coverage determinations were reasonable.[6]   Pl.'s Mem. 8–17.   As a threshold matter, Zalduondo argues that without the Plan document, material issues of fact remain as to whether the Plan grants discretionary authority to Aetna and whether other terms in the SPD that Aetna relies upon in its defense constitute terms of the plan.   *See id.* at 8–12, 17.   Zalduondo bolstered her argument with a citation to *Amara*, wherein the Court clearly stated that terms of an SPD do not constitute terms of the underlying plan.   *Id.* at 9 (citing

---

[6] The Court is perplexed by the content of Zalduondo's argument relating to her denial of coverage claim.   *See* Pl.'s Mem. at 13 n.4 ("Plaintiff requests that this Court review Defendant's decision also on the denial to cover certain treatments . . . contending they were experimental.").   Zalduondo seems to have never read this Court's May 23, 2012, Order, in which the undersigned Judge allowed her to proceed on both the claim of denying the in-network benefit level to Dr. Wolff's procedures *and* of denial of coverage for her procedure.   Order, ECF No. 27.

*Amara*, 131 S. Ct. at 1878).   In its reply, Aetna avers—albeit in ignorance of *Amara*—that an

argument of improper reliance on the SPD in reaching its coverage determination is erroneous

because"'[w]here the terms of a plan and the SPD conflict, the SPD controls.'"   Def.'s Reply ¶

11, ECF No. 47 (quoting *Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003)).

Zalduondo's arguments, coupled with persuasive interpretations of *Amara* in the courts of

appeal and district courts in sister circuits, convince the Court that amidst the emerging case law,

it is prudent to deny Aetna's motion without prejudice and instruct Aetna to supplement the

administrative record with the official Plan document(s).

In *Amara*, the Supreme Court addressed a preliminary question of whether 29 U.S.C. §

1132(a)(1)(B) authorized a district court to change terms of a benefits plan and then order

payment of benefits due under the terms of the plan as reformed.   131 S. Ct. at 1871, 1876–78.

The Court found § 1132(a)(1)(B) unaccommodating to the district court's attempt to reform plan

terms because, in that case, the alteration seemed more like an equitable remedy than

enforcement of a contract.   *Id.* at 1877.   The Solicitor General attempted to argue that, because

the "plan" included summary plan descriptions, which in that case resembled the reformed terms

the court sought to enforce, the court was enforcing the terms of the plan.   *Id.*   The Court flatly

rejected that argument, stating that "terms of statutorily required plan summaries," such as SPDs,

cannot "be enforced (under § 502(a)(1)(B)) as the terms of the plan itself."   *Id.*   Restating its

conclusion, the Court held that summary documents "provide communication with beneficiaries

*about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan for

purposes of § 502(a)(1)(B)."   *Id.* at 1878.   In so deciding, the Court found the ERISA framework

suggested "that the information *about* the plan provided by [summary plan descriptions] is not

itself *part of* the plan."   *Id.* at 1877 (citing 29 U.S.C. § 1022(a)).   To hold otherwise, and make

14

summary language legally binding, the Court opined, would frustrate the objective of summary plan descriptions—"clear, simple communication." *Id.*

In *Pettaway*, decided two months after *Amara*, the D.C. Circuit addressed an issue of first impression—which plan documents the court may look to in determining whether a deferential review applies.  644 F.3d at 433.  The court believed SPDs were "far from . . . irrelevant" and found that the ERISA framework was "[f]ar from suggesting that one plan document must contain all the legally relevant terms and language" and "clearly contemplates multiple relevant documents."  *Id.* at 433–34.  Relying on pre-*Amara* precedent in the majority of its sister circuits, the court held that "the district court properly considered the Plan document, the Summary Plan Description, and the Policy Document to determine the appropriate standard of review to apply in [the] case."  *Id.* at 434 (citing pre-*Amara* cases from the Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits that "have also generally concluded that multiple plan documents are legally relevant").  In reviewing all three plan documents, the court easily concluded that the language of the Plan document, which was echoed in the SPD, gave the requisite discretionary authority to the defendant to establish that the *Firestone* deferential standard of review applied. *Id.* at 434–35.  Because the court verified that the language in the SPD was not inconsistent with the plan document, nor did it create terms not reflected in the plan document, *Pettaway* had no reason to apply *Amara*.

If the plan document itself is not available to validate statements in the SPD, unlike the circumstances in *Pettaway*, *Amara* suggests that reliance on language in the SPD alone in denial of benefits claims may be unwarranted.  *See McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 182 n.5 (4th Cir. 2012) (finding that, where "only the SPD, and not the plan itself, was before the district court and before [the court of appeals]" and "[b]ecause [plaintiff's] claims and

[defendant's] defenses depend[ed] upon the contents of the plan, their resolution on remand [would] require the actual plan documents."); *see also Moffett v. Prudential Life Ins. Co. of Am.*, Nos. 09-cv-1915 & 11-cv-454 (RLW), 2012 WL 5989931, at *3 (D.D.C. Nov. 30, 2012) (dismissing plaintiffs' reliance on *Amara* but acknowledging that, although not the issue before the court in that case, *Amara* could give rise to "a credible issue as to whether certain terms in the summary plan documents are terms that the Court can 'enforce' within the meaning of § 1132(a)(1)(B)").

In *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, the Tenth Circuit interpreted *Amara* as offering either one of two propositions: "(1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents."  663 F.3d 1124, 1131 (10th Cir. 2011).  The court did not apply either of its interpretations, however, because it concluded that, based on clear language in the SPD, the SPD *was* the plan.  *Id.*  Only after a district court concludes that an SPD is part of the underlying plan, the court held, can it rely on language of the SPD.  *Id.*  There, the court was satisfied that the SPD was a sufficient basis to establish deferential review of the insurance company's decision to deny benefits under the plan because "the language in the SPD [was] also the language of the [plan]."  *Id.* at 1132.  In addition to relying on the fact that the SPD contained the plan language, the court found no need to review absent plan documents because the plaintiff never asked for them during discovery and the defendant affirmatively maintained that the only missing plan document "had no bearing on the discretion afforded to [defendant]."  *Id.*

At the other end of the spectrum, a district court in the Second Circuit recently held that where an SPD expressly stated that it was *not* part of a plan, and language granting discretionary

authority was found in the SPD but not the plan, the attempted grant of discretion was ineffective. *Durham v. Prudential Ins. Co. of Am.*, 890 F. Supp. 2d 390, 395 (S.D.N.Y. 2012). One month after *Durham*, Magistrate Judge Cheryl Pollak recommended a similar conclusion as to the applicable standard of review when there is a clear grant of discretion in an expressly un-incorporated SPD but ambiguous language in the plan document, summarizing her extensive analysis as follows:

> Simply put, the SPD, which was explicitly not included as part of the Plan, demonstrates that Prudential [who drafted the plan documents] knew how to draft the language necessary to confer discretionary authority to itself. Even though defendant urges the Court to look at the SPD simply for the purpose of illuminating the drafter's intent, such an interpretation would elevate the SPD language above that of the Plan itself—something the *Amara* Court found to be contrary to the purpose of the SPD as set forth in ERISA.

*Hamill v. Prudential Ins. Co. of Am.*, No. 11-cv-1464 (SLT), 2012 WL 6757211, at *9 (E.D.N.Y. Sept. 28, 2012). In *Hamill*, the SPD "expressly stat[ed] (in large print) that '[t]he Summary Plan Description is not part of the [official plan documents].'" *Id.* at *5 (quoting the SPD) (distinguishing the facts of the case with those in *Eugene*). *See Sullivan v. Prudential Ins. Co. of Am.*, No. 2:12-cv-01173-GEB-DAD, 2013 WL 1281861, at *1–2 (E.D. Cal. Mar. 25, 2013) (holding that a *de novo* standard of review applied to the ERISA denial of benefits claim because the defendants could not "point to any other language in the plan documents imbuing the administrator with discretion" other than that found in the expressly unincorporated SPD).

Here, the language of the SPD places this Court in uncharted waters. The prefatory disclaimer in the SPD, AR 167, prevents this Court from adopting the course of action in *Eugene*. The disclaimer clearly provides that it is not the verbatim language of the Plan.[7]

---

[7] In coincidental accordance with *Amara*, the SPD provides that the benefits described therein are controlled by the underlying Plan documents.

Unlike the SPDs in *Durham*, *Hamill*, and *Sullivan*, however, the language does not go so far as to expressly un-incorporate the SPD from the Plan.

Aetna relies on only the terms of the SPD when arguing that a discretionary standard of review applies, *see* Def.'s Mem. at 6–10, and in its defense of Zalduondo's denial of benefits claims, *id.* at 6–12. The administrative record includes the ASA between WPP Group and Aetna; however, Aetna makes no attempt—even in its reply to Zalduondo's opposition—to rely on the ASA. Aetna's motion contains a singular reference to the ASA, pointing to the contract as evidence that the Plan is self-funded by WPP Group. Def.'s SUMF ¶ 5. Because the Court previously denied discovery of the Plan document itself, it will not go so far, at this time, as declaring that a *de novo* standard of review applies to the § 1132(a)(1)(B) claims.

This Court may *eventually* rely on the terms in the SPD, as the court did in *Pettaway*, but only after the SPD *and* the official Plan document(s) are before the Court so that the parties may argue, and so that the Court may determine, whether the *Firestone* discretionary standard of review applies and whether Zalduondo was inappropriately denied benefits under the terms of the Plan. Thus, the Court will deny Aetna's motion for summary judgment and instruct Aetna to produce the Plan document(s) no later than 14 days from the date of this opinion. This course of action best complies with *Amara*, which, in light of persuasive interpretations thereof in a number of other circuits, this Court reads as providing that it cannot enforce the terms of the SPD alone unless it is satisfied that the SPD terms relevant to this matter are authorized by, or not inconsistent with, the Plan.

## IV.    CONCLUSION

For the foregoing reasons, Aetna's motion for summary judgment is denied without prejudice. Aetna must produce the official Plan document(s) no later than 14 days from the date

of this opinion.  The parties should file any summary judgment motions no later than 21 days after the Plan documents are filed, with oppositions and replies filed in accordance with the Court's local rules.

A separate order consistent with this memorandum opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on April 25, 2013.